BENEFICIAL PERSONNEL SERVICES
OF TEXAS, INC., and Business
Staffing, Inc., Appellants,

v.

Noel PORRAS, Appellee.

No. 08–94–00169–CV.

Court of Appeals of Texas,
El Paso.

June 27, 1996.

Rehearing Overruled Aug. 14, 1996.

Rick G. Strange, Cotton, Bledsoe, Tighe & Dawson, Midland, for appellant.

Robert Trenchard, Jr., Trenchard & Buckingham, Kermit, for appellee.

Before BARAJAS, C.J., and LARSEN and McCLURE, JJ.

## OPINION

LARSEN, Justice.

This appeal stems from on-the-job injuries sustained by Noel Porras while working for Beneficial Personnel Services of Texas, Inc. ("BPS"). A jury found BPS had committed fraud, had breached its employment contract with Porras, and was negligent. It assessed $42,128 in actual and $150,000 in exemplary damages. After verdict, Porras filed a trial amendment adding Business Staffing, Inc. as an additional defendant. The trial court granted the trial amendment, and rendered judgment against both BPS and BSI. Defendants appeal.

### FACTS

Noel Porras is an oil field worker in Ward County, Texas. Before 1991, he was employed by White Well Service as a well service floorhand. Mr. Porras is a high school graduate and, before his industrial accident, was a baseball pitcher of some talent. He is married to Carmen Porras and they have two small children.

In 1991, Beneficial Personnel Services of Texas, Inc., an employee leasing company, approached White Well Service's owner,

Johnny White. BPS proposed that White Well fire all its employees, who would be immediately hired by BPS and leased back to White Well to perform exactly the same work. As part of the agreement, BPS provided administrative services for personnel. These services were to include benefits for injuries compensable under the Texas Workers' Compensation Act, but not through the state-sanctioned compensation system. That is, although BPS obligated itself to provide benefits, it would not purchase insurance from subscribers to the Texas Workers' Compensation Act. White Well agreed to this arrangement and fired all its employees, including Noel Porras. The employees were immediately hired by BPS, and leased back to White Well to perform the same work.

When his employment was changed from White Well to BPS, Noel Porras signed an agreement which provided:

3. *WORKER'S COMPENSATION BEN-EFITS.* BPS has agreed in the PERSONNEL LEASE AGREEMENT with its Client Company to provide worker's compensation benefits provided by a non-admitted insurance carrier to EMPLOYEE for injuries compensable under the Texas Worker's Compensation Act and similar acts of other jurisdictions (collectively referred to as the 'Act') while EMPLOYEE is assigned to CLIENT COMPANY and to waive (give up) their common law defensed [sic] against the EMPLOYEE as set forth in the corresponding Act. In exchange, the *EMPLOYEE agrees to limit his/her recovery* against BPS and CLIENT COMPANY for such compensable injuries *to benefits allowed by the corresponding Act.* These benefits are provided by a non-admitted insurance carrier.

Because our worker's comp. benefits are provided by a non-admitted carrier the New 'Act' requires that BPS provide you with the following statement:

"BPS DOES NOT have worker's compensation insurance coverage to protect you from damages because of work-related illness or injury."

On May 13, 1992, while servicing an oil rig, a stuffing box fell on Porras's left hand. The blow severed the tip of his left index finger almost completely. He was taken to Ward Memorial Hospital, where he was seen in the emergency room by Dr. Adolfo Rama. After examining Porras and taking x-rays, Dr. Rama amputated the fingertip. On June 2, 1992, Dr. Rama released Porras to return to light duty in two weeks, as of June 15. Porras continued to have swelling and pain, however, and called BPS requesting to see an orthopedic specialist, Dr. O.T. Garza, who had successfully treated Porras's father-in-law for a knee injury. BPS's representative refused to authorize the treatment, telling Porras, "Well, if you don't go to light duty, I'm sorry, but I'm not a doctor and you're on your own. . . ." After that date, BPS paid Porras nothing for medical treatment, nothing for temporary income benefits, and nothing for impairment income benefits. Although Dr. Rama's release for light duty contemplated a return to work on June 15, BPS fired Porras as of June 10, allegedly for refusing to return for light duty. BPS never explained this anticipatory termination, nor did it tell Porras he was terminated. During his recuperation, BPS sent Porras $920 for four weeks wage replacement, approximately one-half of his average weekly wage of $460.

In August 1992, Porras went to see Dr. Garza, who found he still had swelling at the amputation and prescribed physical therapy. Dr. Garza did not release Porras to return to work until October 1992. Porras contacted White Well, only to be told he had been fired in June.

Porras's injury resulted in an 8 percent impairment to his whole body, according to the AMA guidelines used by the Texas Workers' Compensation Commission to establish disability ratings. BPS paid him nothing for his disability, however, until after he had filed this lawsuit, and even then paid him only 50 percent of his average weekly wage, instead of the 70 percent he would have received under the Act.

Porras filed suit against a number of entities; all but BPS either settled or were severed from this suit before trial. The unanimous jury made the following findings:

1. The negligence of BPS's employees other than Porras proximately caused his injury of May 13, 1992.
2. Reasonable compensation for Porras's injuries would include $5,000 for physical pain and mental anguish; $19,380 for loss of earnings and earning capacity; $8,832 for disfigurement; and $2,916 for medical care.
3. BPS agreed to provide Porras with the same amount and types of benefits he would have received under Texas workers' compensation law, and BPS did not comply with that agreement.
4. Porras agreed to limit his ability to change doctors in non-emergency situations, and to limit his recovery to those benefits he could obtain under the Texas Workers' Compensation Act.
5. BPS committed fraud against Porras concerning the existence and type of workers' compensation benefits it would provide.
6. Porras's fraud damages would include $1,500 for damage to credit reputation in the past; $1,500 for damage to credit reputation in the future; $1,500 for mental anguish in the past; and $1,500 for mental anguish in the future.
7. Exemplary damages for BPS's fraud should be assessed at $150,000.

The trial court entered judgment on the tort causes of action, and made the following finding on the contract between BPS and Porras:

The Court further finds that Defendant Beneficial Personnel Services of Texas, Inc. was not a subscriber to the Workers Compensation Act of the state of Texas. The Court further finds that the contractual attempt of said Defendant to limit its liability resulting from an injury sustained by an employee in the course and scope of employment to those benefits provided by the Texas Workers Compensation Act is void under the laws and statutes of the state and further void as against public policy.

The trial court also granted a trial amendment finding that BPS had changed its name

to "Business Staffing, Inc." and finding that BPS and BSI were one and the same corporation, and included that finding in the judgment. BPS and BSI appeal, urging twenty points of error. We affirm.

### *Name Change*

■ In Point of Error One, appellants claim that the trial court erred in rendering judgment against BSI, a non-party.[1] BSI was not named as a defendant prior to trial, but BPS's corporate representative, Kenneth Cobb, called as an adverse witness by plaintiff, testified:

Q: And your occupation?
A: I'm Director of Risk Management.
Q: And is that for BPS of Texas, Inc.?
A: Yes, sir, BSI.
Q: Okay, and what's BSI?
A: Business Staffing, Incorporated.
Q: Is that Oklahoma?
A: No, sir, that's our new—we've changed names. We got out of BPS of Texas. We've gone into BSI.

. . . . .

Q: Mr. Cobb, are you appearing here today as the corporate representative of Beneficial Personnel Services of Texas, Inc.?
A: Yes, sir.
Q: Is that still the name—have you changed the name of the business?
A: Yes, sir, we went to BSI because BPS of Texas limited us by the name itself to Texas.
Q: The same company?
A: Yes, sir.
Q: Just a different name?
A: Yes, sir.

Defense counsel made no objection to this evidence volunteered by his corporate representative, and indeed used the names "BPS" and "BSI" interchangeably throughout trial. Based on this testimony, Porras requested a trial amendment to include BSI as a defendant, urging that the two entities were one and the same. The trial court agreed, and

---

1. Although BPS and BSI appear to have adverse interests on this legal point, we note that they have filed a joint brief and appear before this Court through the same attorney.

entered judgment which included the following paragraph:

> The Court further finds that Defendant has changed its name to Business Staffing, Inc. and that the said Business Staffing, Inc. is the same corporation as Defendant herein.

Defense counsel belatedly objected to the trial amendment and filed a motion to modify the judgment to delete Business Staffing, Inc.[2]

■ It is true that generally, judgment shall not be rendered against one who is neither named nor served as a party defendant. Tex.R.Civ.P. 124; *Werner v. Colwell,* 909 S.W.2d 866, 869 (Tex.1995). One exception to this rule is when a party waives service by making a general appearance before the court. *Id.* at 869–70. We believe that this case presents another exception: where there is clear, uncontroverted, unequivocal and unsolicited testimony by a corporate representative that the two entities are one and the same, where defense counsel makes no objection to that testimony, and even refers to the defendant by both names interchangeably throughout trial. We also find it significant that the corporate representative volunteered the name change information, without prompting by either side. A trial court has broad discretion to allow a party to amend its pleadings to conform to evidence adduced at trial. Tex.R.Civ.P. 66, 67; *Texas Employers' Insurance Assoc. v. Gutierrez,* 795 S.W.2d 5, 7 (Tex.App.—El Paso 1990, writ denied). Absent a showing of surprise or prejudice, it is an abuse of discretion for the trial judge to refuse a trial amendment. *Greenhalgh v. Service Lloyds Ins. Co.,* 787 S.W.2d 938, 939 (Tex.1990); *Zavala v. Trujillo,* 883 S.W.2d 242, 245 (Tex. App.—El Paso 1994, writ denied). We believe that here it was established as a matter of law, by BPS's own corporate representative, that the two entities (if there are two

entities) were interchangeable. Under these facts, it would have been an abuse of discretion for the trial court to deny a trial amendment including Business Staffing in the judgment. Point of Error One is overruled.

### The Contract

In Points of Error Two and Three, appellants urge that the trial court erred in holding the employment contract between Porras and BPS[3] was void, as: 1) Porras did not plead illegality; 2) the statute relied upon by the court does not apply; 3) Texas law and policy support such a contract; and 4) the trial court's conclusion conflicts with the jury findings. We find that enforceability of the contract was sufficiently pleaded, and that Texas public policy precludes the employer from indemnifying itself from its own negligence in the manner it has attempted here.

#### a. pleading

■ First, we reject the contention that enforceability was not properly an issue before the court. We believe that Porras did raise the issue sufficiently to put defendant on notice of his contention. We note that plaintiffs' fifth amended petition included the following assertion:

> [T]he employment contract provisions limiting damages sought to be enforced ... is unconscionable and should be held void as against public policy....

We believe that Porras's petition sufficiently demonstrated his intention to challenge the enforceability of the contract between himself and BPS.

#### b. public policy

Secondly, BPS urges that its contract is permitted by Texas law and is not contrary to public policy. In support of this argument, it cites a number of cases which have upheld an employee's efforts to enforce these

---

2. The grounds urged for doing so consisted of certificates of good standing dated April 5, 1994 from the Texas Comptroller, stating that BPS and BSI had both paid franchise taxes through May 1994. There was no evidence, however, that BPS and BSI had been separately incorporated at the time of trial in February 1994. In the face of the clear, uncontroverted, and unsolicited testimony from the corporate representa-

tive that the two were one and the same, we find these certificates of good standing to be insufficient evidence to overcome the trial court's conclusion that the two were identical.

3. For the remainder of the opinion, "BPS" shall refer to BPS and BSI jointly.

contracts. *Texas Health Enterprises, Inc. v. Gentry,* 787 S.W.2d 604 (Tex.App.—El Paso 1990, no writ); *Tigrett v. Heritage Building Co.,* 533 S.W.2d 65, 70 (Tex.Civ.App.—Texarkana 1976, writ ref'd n.r.e.); *Employers Mutual Casualty Co. v. Poorman,* 428 S.W.2d 698 (Tex.Civ.App.—San Antonio 1968, writ ref'd n.r.e.); *United States Fidelity & Guaranty Co. v. Valdez,* 390 S.W.2d 485 (Tex.Civ.App.—Houston 1965, writ ref'd n.r.e.). BPS points out that only one case has found such a contract unenforceable, and that was because the agreement failed to waive the employer's common law defenses. *Hazelwood v. Mandrell Industries Co., Ltd.,* 596 S.W.2d 204 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). Because BPS's contract with Porras waived common law defenses, it thus concludes that the contract is enforceable.

We think public policy is contrary, however, because this employee agreement violates the fair notice doctrine. Thus, although an employee can elect to enforce such a contract (thus explaining the line of cases relied upon by BPS) we hold that an employer, desiring to engage in this extraordinary shift of common-law liability outside the auspices of the state-sanctioned workers' compensation system, does not enjoy the same ability.

■ The fair notice doctrine in Texas has evolved in cases where one party to a contract seeks to transfer the risk of liability for its own negligence to the other party. It includes two requirements: the express negligence doctrine and conspicuousness. *Enserch Corp. v. Parker,* 794 S.W.2d 2, 8 (Tex. 1990). The express negligence doctrine provides that a party seeking release or indemnity from the consequences of its own negligence must express that intent in specific terms. Under this test, the intent of the parties must be specifically stated within the four corners of the contract in order for such provision to be enforceable. *Dresser Industries, Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 509 (Tex.1993); *Atlantic Richfield Co. v. Petroleum Personnel, Inc.,* 768 S.W.2d 724, 725 (Tex.1989); *Ethyl Corp. v. Daniel Construction Co.,* 725 S.W.2d 705, 707–08 (Tex.1987). The conspicuousness requirement mandates that the intent to transfer liability must appear on the face of the contract in such a way as to attract the attention of a reasonable person looking at it; that is, it must be conspicuous. *Dresser Industries,* 853 S.W.2d at 508.

■ In its brief before this Court, BPS/BSI argues that a voluntary employment contract such as the one it entered with Porras serves to promote public policy goals because it "(1) provide[s] workers' compensation benefits for the lost earning capacity and medical expenses due to an injury, but not for pain, suffering, or the injury itself; and (2) *avoid[s] litigation of fault in return for limited, but easily ascertainable damages.*" Porras's employment agreement "guaranteed Porras the workers' compensation benefits for lost earning capacity and medical expense, and it *relieved him of the burden of proving fault.*" "If voluntary contracts are no longer enforceable, then the employer either gratuitously continues paying benefits . . . or it can simply withdraw its offer. In the latter case injured employees will lose their right to medical payments and temporary disability payments, *but must file negligence actions* (for which they carry the burden of proof) against their employer." Thus, BPS's own argument acknowledges that the employment agreement is, at bottom, a release of liability for BPS's own negligence. That the jury did indeed find BPS negligent in causing Porras's injury supports this conclusion. That BPS agreed to make certain limited payments in return for the release from negligence liability does not, in our view, relieve it of its obligation to comply with the fair notice doctrine. For BPS to enforce the agreement, therefore, it must show that the contract complies with the fair notice doctrine, a question of law. *Dresser Industries,* 853 S.W.2d at 509. It clearly does not.

■ The employment agreement makes no mention of negligence, waiver of common law rights, or any other specific statement that the parties intended to waive liability for BPS's acts of negligence committed in the future. The only reference to Porras's waiver of his common law rights is the statement *"the EMPLOYEE agrees to limit his/her recovery* against BPS and CLIENT COM-

PANY for such compensable injuries *to benefits allowed by the [workers' compensation] Act.*" In contrast, clauses which have been held enforceable under the express negligence doctrine must contain unambiguous language such as: "Diamond Shamrock agree[s] to indemnify Moran against all bodily injury, death and property claims by its employees or the employees of its contractors 'without limit and without regard to the cause or causes thereof or the negligence of any party or parties,....'" *Maxus Exploration, Co. v. Moran Brothers, Inc.,* 817 S.W.2d 50, 56 (Tex.1991); "PPI agrees to ... indemnify ... ARCO ... in any matter arising from the work performed hereunder, including but not limited to any negligent act or omission of ARCO,...." *Atlantic Richfield Company v. Petroleum Personnel, Inc.,* 768 S.W.2d 724, 726 (Tex.1989); "Contractor hereby indemnifies and agrees to protect, hold and save Union Texas ... harmless from and against all claims, ... including but not limited to injuries to employees of Contractor, ... on account of, arising from or resulting, directly or indirectly, from the work and/or services performed by Contractor ... and whether the same is caused or contributed to by the negligence of Union Texas, its agent or employees,...." *Permian Corp. v. Union Texas Petroleum Corp.,* 770 S.W.2d 928, 929 (Tex.App.—El Paso 1989, no writ). From these examples, it is clear that the express negligence doctrine means exactly what the name implies: an enforceable release of liability from negligent acts must expressly state that is what the parties intend. The employment agreement here wholly fails to meet the requirements of the express negligence doctrine, and we therefore hold that BPS may not enforce it where its employee sought to assert his common law rights against the company.[4] We overrule Points of Error Two and Three.

### Contract Construction

▪ In Points of Error Four and Five, appellants urge that the trial court erred in ruling that the employment contract between Porras and BPS was ambiguous, and therefore also erred in submitting a question to the jury to ascertain the meaning of that contract. For the reasons set out in our discussion of Porras's right to recover in fraud, we believe the trial court correctly found that the contract was ambiguous as to whether workers' compensation insurance, or benefits, would be provided by BPS, and what exactly those terms meant. Moreover, as we have held that BPS could not enforce the contract against Porras in light of its failure to comply with the fair notice doctrine, any error in holding the contract ambiguous is harmless. Points of Error Four and Five are overruled.

### Recovery on Tort Claims

In Points of Error Six and Seven, appellants urge that the trial court erred in entering judgment on Porras's negligence and fraud claims, as Porras was contractually limited to recovery for breach of contract, and because entering such judgment was inconsistent with the jury's finding that Porras had contractually agreed to limit his recovery to the benefits available under the Texas Workers' Compensation Act. Because we have found the contract to be insufficient under the express negligence doctrine, and therefore unenforceable by BPS, we find these arguments without merit. Points of Error Six and Seven are overruled.

### Fraud Recovery

▪ In Points of Error Eight and Ten, appellant contends that the record does not support the jury's finding that BPS committed fraud, nor any conclusion that BPS did more than breach the employment contract, and further claims there was no evidence or insufficient evidence to support a fraud recovery. Specifically, BPS asserts that the trial court erred in entering judgment based on fraud, as any failure to provide benefits as promised constitutes only a breach of the employment contract between BPS and Porras; thus Porras's complaint that BPS misrepresented the existence and

---

4. Because we find that contract was unenforceable under well-established common law principles, we need not reach the question of whether the contract was void under Tex.Labor Code Ann. § 406.052 (Vernon Pamph.1996).

type of workers' compensation benefits is really only a complaint for breach of contract. Nevertheless, in answer to question number six, the jury responded "yes" to this inquiry:

> Did Beneficial Personnel Services of Texas, Inc. commit fraud against Noel Porras with regard to representations concerning the existence and type of workers compensation benefits which would be provided to him?

The trial court properly charged the jury on the elements of common law fraud, that: (1) the party makes a material misrepresentation; (2) with knowledge of falsity or made recklessly without any knowledge of its truth and as a positive assertion; (3) made with intent that it be relied upon by the other party; (4) that the party actually relied upon it; and (5) that the party suffer injury. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983); *Stone v. Lawyers Title Insurance Corp.*, 554 S.W.2d 183 (Tex.1977); *State National Bank of El Paso v. Farah Manufacturing Co.*, 678 S.W.2d 661 (Tex.App.—El Paso 1984, writ dism'd by agr.). The trial court likewise properly instructed the jury that a misrepresentation means: (1) a false statement of fact, or (2) a promise of future performance made with intent not to perform, or (3) a statement of opinion based on a false statement of fact, or (4) an expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion. *Trenholm*, 646 S.W.2d at 930; *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434–35 (Tex. 1986); *Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex.1990). We must determine whether this case was properly submitted as fraud, or whether it sounds in contract only. We conclude that the trial court was correct in determining that the facts here supported a jury question on fraud.

 In arguing that this case sounds only in contract, BPS relies upon several statements made by our Supreme Court that, although the contractual relationship between parties may create duties under both contract and tort law, the nature of an injury most often determines whether contract or tort duties have been breached. "When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone." *Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex. 1991), *quoting Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986). This may be true, but we think this doctrine must be carefully applied in fraud cases, particularly fraud cases involving a contract. At first glance, this line of reasoning would seem to preclude *any* fraud action involving a contract. We do not believe this is what the Supreme Court intended by the statement cited above. Rather, where defendant fraudulently induces plaintiff to enter a contract, clearly a tort action exists. "Fraud in the inducement is fatal to a contract. One induced by fraud may stand to the bargain and recover damages for the fraud or he may rescind." *L & B Oil Co., Inc. v. Arnold*, 620 S.W.2d 191, 193 (Tex.Civ.App.—Waco 1981, writ dism'd); *Polar Bear Ice Cream Co., Inc. v. Earhart*, 603 S.W.2d 388 (Tex.Civ.App.—Waco 1980, writ dism'd), *see Olney Savings & Loan Assoc. v. Trinity Banc Savings Assoc.*, 885 F.2d 266, 276 (5th Cir.1989). Moreover, the acts of a party may breach duties in tort or contract alone or simultaneously in both. *DeLanney*, 809 S.W.2d at 495; *Reed*, 711 S.W.2d at 618. In this case, fraud exists if BPS falsely induced Porras into entering its employment contract by promising workers' compensation benefits, equal to those available under Texas law, that it had no intention of providing. We therefore turn to the question of whether legally and factually sufficient evidence supports the jury's verdict that BPS fraudulently represented to Porras the existence and type of workers' compensation benefits available to him.

#### a. material misrepresentation

 To recover in fraud, plaintiff must first prove that defendant made a material misrepresentation. Material means that the matter is important to the defrauded party in making a decision: "Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *American Medical International Inc. v. Giurintano*,

821 S.W.2d 331, 338 (Tex.App.—Houston [14th Dist.] 1991, no writ). A misrepresentation may be made in several ways. Here, the jury was told it could find misrepresentation if defendant made a false statement of fact, a promise of future performance made with intent not to perform, a statement of opinion based on false statement of fact, or a false expression of opinion made by one claiming or implying special knowledge. *Trenholm,* 646 S.W.2d at 930; *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432 (Tex.1986).

In this case, the evidence shows that BPS made a material misrepresentation regarding the type and existence of workers' compensation benefits it intended to obtain for employees. Porras testified that when the employees were switched from White Well Service to BPS they were told "everything was going to stay the same." White Well Service had provided its employees workers' compensation benefits from a subscribing carrier. Porras testified that he thought he would still have workers' compensation benefits available to him if he were hurt on the job, and that if he had been told he would not, he would have sought work elsewhere. No one explained to him that BPS did not have licensed workers' compensation insurance. After he was hurt, he went to the Midland workers' compensation commission office to seek help, but was told they had no jurisdiction over his claim. BPS told Porras and other workers from White Well Service that they would have workers' compensation "just like under Texas law," which turned out to be a lie. Noel Porras's brother, Carlos Porras, testified that he, too, thought BPS had workers' compensation insurance when they took over in 1991. He testified that everyone on the crew thought that they were insured, just as they had been with White Well Service.

BPS's corporate representative, Larry Ashcroft Smith, testified that although its insurer, Corporate Underwriters, was not licensed to do business in Texas and indeed was under an injunction throughout the relevant time period not to solicit business in Texas, nevertheless BPS saw no need to disclose the status of its insurer to White Well Service or its employees, because "as far as we were concerned, our insurance had been procured properly, and there was no intent to do anything other than what was proper." He admitted that the contract and employees' instructions regarding workers' compensation benefits (drafted by BPS) were confusing. Another BPS representative, Kenneth Cobb, testified that his company told White Well and its employees that it would provide the same benefits they would receive under Texas Workers' Compensation law. BPS knew that people would rely on that representation in deciding to enter BPS's program: "BPS promises its employees that they're going to follow Texas law in providing them benefits if they get hurt on the job." Cobb maintained that BPS did indeed comply with that promise. Johnny White, owner of White's Well Service, testified that when BPS approached him about hiring and leasing back his employees, BPS represented to him that it would have workers' compensation insurance, and he believed this. This was a misrepresentation that he did not discover until later. It was because of these representations that he agreed to allow his employees to become employees of BPS. White later sued BPS for failing to provide workers' compensation benefits equal to those available under state law. White compared his BPS experience to being "taken in" at the carnival. White never realized that BPS was not carrying workers' compensation insurance from a subscribing carrier until his injured ex-employees started suing White Well Service in an attempt to obtain the benefits they had been promised. The documents setting out BPS's policy were themselves misleading. They promised "workers' compensation benefits"[5] for "injuries compensable under the Texas Worker's Compensation Act" in amounts "allowed by the corresponding Act." Materiality was established.

### b. *false*

 To establish fraud, the material representation must be false when it is made.

---

5. BPS places importance on the contract's use of the term "benefit" rather than "insurance coverage." We conclude that reading the agreement as a whole, the term "benefit" is ambiguous at best and deliberately misleading at worst.

*Trenholm,* 646 S.W.2d at 930. Even where a representation is literally true, if it is used to create an impression that is substantially false, it will satisfy this element. *Farah,* 678 S.W.2d at 681; *Blanton v. Sherman Compress Co.,* 256 S.W.2d 884, 887 (Tex.Civ. App.—Dallas 1953, no writ).

Here, the very documents which set out the contract between BPS and Porras belie the promise to provide the same benefits equal to those allowed under the Texas Workers' Compensation Act. BPS's "Workers' Compensation Policy" specifically states that medical treatment for on-the-job injuries "require that you go to a Doctor authorized by BPS/White Well Service." This is clearly contrary to the Act, which mandates that "the employee is entitled to the employee's initial choice of a doctor from the commission's list," and provides criteria for allowing an employee to select an alternate doctor. Tex.Labor Code Ann. § 408.022 (Vernon Pamph.1996); 28 Tex.Admin.Code § 126.9 (West 1996)(Tex.Workers' Compensation Comm'n, Choice of Treating Doctor and Liability for Payment). The evidence is uncontroverted that BPS prohibited employees from selecting their own doctors when they were injured at work. Moreover, BPS paid Porras only one-half of his average weekly wage as a temporary income benefit, rather than the 75 percent he would have received under the Act. Tex.Labor Code Ann. § 408.103 (Vernon Pamph.1996).[6] BPS ceased paying weekly benefits before receiving any certificate by a treating physician that Porras had reached maximum medical improvement. Such certification is required before temporary income benefits may be terminated under the Act. Tex.Labor Code Ann. § 408.102 (Vernon Pamph.1996). BPS never attempted to pay Porras his impairment income benefits until after Porras filed suit. Such benefits must be paid under the Act once a percentage of permanent disability is established. Tex.Labor Code Ann. § 408.121 (Vernon Pamph.1996).[7] The evidence supports the jury's finding that BPS's assertion it would provide "benefits allowed by the [Texas Workers' Compensation] Act" was false when made.

### c. *knowledge of falsity or reckless disregard*

Plaintiff must prove that defendant either knew that the statement was false at the time it was made or made it as a positive assertion without knowledge of its truth. *Trenholm,* 646 S.W.2d at 930. Clearly, BPS either knew that it would not provide benefits equal to those available under the Workers' Compensation Act, or made that promise to its potential employees and client companies without any notion of what that obligation entailed. BPS refused to pay for any of Porras's treatment other than that provided by its selected doctor. At the time of trial, BPS had not paid Porras's medical bills for treatment by a specialist of the patient's choosing, nor for physical therapy prescribed by that specialist. Indeed, BPS had not even paid hospital bills for treatment it *had* authorized. BPS made no attempt to pay Porras his impairment income benefits until after suit was filed, and even then, the amount paid was less than he would have been entitled to under the Act. BPS ceased making temporary disability benefits before any doc-

---

**6.** For the first twenty-six weeks following injury, under the Labor Code, Porras would be entitled to 75 percent of his average weekly wage minus his actual earnings, as he earned less than $8.50 per hour. The evidence shows he had no actual earnings following the injury.

**7.** Numerous other benefits are available under the Act but could never be provided by any but the largest employer under a private plan. It is undisputed that BPS had none of these protections: lifetime medical benefits Tex.Labor Code Ann. § 408.021 (Vernon Pamph.1996); financial hardship advances Tex.Labor Code Ann. § 408.085 (Vernon Pamph.1996); subsequent injury find for a second compensable injury Tex.Labor Code

Ann. § 408.162 (Vernon Pamph.1996); exemption of benefits from legal process including garnishment, attachment, judgment and other actions or claims Tex.Labor Code Ann. § 408.201 (Vernon Pamph.1996); limitation of percentage and requirement for approval of attorney's fees Tex.Labor Code Ann. § 408.221 (Vernon Pamph. 1996); sanctions against insurance carrier who terminates or reduces benefits without reasonable grounds Tex.Labor Code Ann. §§ 409.023–024 (Vernon Pamph.1996); services of an ombudsman Tex Labor Code Ann. §§ 409.041–042 (Vernon Pamph.1996); and administrative proceedings for settling disputes Tex.Labor Code Ann. §§ 410.001–308 (Vernon Pamph.1996).

tor (even one of its own selection) certified that Porras had reached maximum medical improvement. Kenneth Cobb testified that BPS had no procedures in place to insure that its claims adjusters knew how to administer workers' compensation benefits; he admitted that if BPS prohibited Porras from changing doctors, if Porras's average weekly wage was $460 and his temporary income benefit was $230, that would be less than Texas law required; if Porras's payments were discontinued before he was released by the specialist he had selected, that would be prohibited under the Texas Act; and finally, he admitted that BPS would have been required to pay the specialist's bill under Texas law.

A jury could reasonably conclude that BPS either had no idea what the Texas Workers' Compensation Act required, and therefore acted recklessly in promising to provide those benefits, or that it never had any intention of providing the same benefits available under the Act. This element of fraud is supported by the evidence.

#### d. intent

■ The defendant must intend its false representation to induce action. *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281 (Tex.1994). While a party's intent is determined at the time the party made the representation, it may be inferred from subsequent acts. *Spoljaric*, 708 S.W.2d at 434. Although failure to perform, standing alone, is not sufficient to establish intent not to perform when the promise was made, it is evidence that may be considered with other facts to establish intent. *Id.* at 435. Slight circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent. *Id.*

Here, the jury's finding of intent is supported by direct testimony by BPS's corporate representatives: Cobb testified that his company told White Well and its employees that it would provide the same benefits available under Texas Law as part of the total package it sold to its clients, and that BPS "knew they would rely on that." BPS made the same representation to all its 250 client companies. Although BPS made that promise, its own directive to employees stated it would not allow employees to select their own doctors, an impermissible restriction under Texas law. Thus, direct evidence of intent not to perform as promised is contained in the company's own documents. Moreover, Kenneth Cobb, director of risk management for BPS/BSI, acknowledged that prohibiting an employee from changing doctors would not be permitted under the Texas Workers' Compensation Act, that paying an employee $230 a week in compensation benefits, where the average weekly wage was $460, would be less than the law required, that discontinuing benefits before release by the treating specialist would be prohibited under the Compensation Act, and that the Act would have required them to pay the specialist selected by the employee. BPS would have been obligated to pay impairment income benefits, which it did not do. The evidence established that BPS breached its agreement to pay benefits "under Texas law" in each of these particulars. Evidence of intent is sufficient to sustain the jury verdict.

#### e. reliance and injury

Plaintiff Porras was required to demonstrate that he relied upon the fraudulent misrepresentation to his detriment. *Trenholm*, 646 S.W.2d at 931, 933. Noel Porras testified that he relied on the representation that BPS provided workers' compensation benefits equal to those available under the Act; his brother testified that he and all the other crew members believed the same. Johnny White likewise testified that he relied upon BPS's promise to provide compensation benefits in agreeing to the leasing arrangement. BPS representatives testified they intended their client companies, and employees, to rely on the representation that it would provide benefits commensurate with those available under Texas law. Reliance was uncontroverted.

Finally, plaintiff bore the burden of establishing injury resulting from BPS's misrepresentation. This he did by showing that he suffered damage to his credit reputation when BPS refused to pay his orthopedic

specialist and physical therapist, and that he was fired for failing to return to light duty when his treating specialist did not release him until several months later. Alternatively, he proved that he was fired for seeking a second opinion from a specialist, that he received significantly less in monetary benefits than he should have received under Texas law, that his marriage and family life suffered from the stress he was placed under, that his utilities were cut off, and that he was forced to borrow money from his family. Injury was established.

We conclude that there was both legally and factually sufficient evidence to support the jury's fraud finding here. Points of Error Eight and Ten are overruled.

### Fraud Damages

■■ In Point of Error Eleven, BPS urges that the trial court erred in entering judgment for fraud when no pecuniary damages were assessed against the company. It argues that "[a] plaintiff must plead and prove he suffered a *pecuniary* loss which is directly traceable to and which resulted from the false representation upon which he relied." This argument, as we perceive it, is directly contrary to BPS's earlier points of error claiming that a cause of action *cannot* be fraud if the damages are to the economic subject matter of the contract. BPS cannot have it both ways. Loss of credit reputation and mental anguish are both recognized elements of damage for fraud, and Porras properly obtained findings on those elements. *Dillard's Department Stores, Inc. v. Strom,* 869 S.W.2d 654, 659 (Tex.App.—El Paso 1994, writ dism'd by agr.)(mental anguish award in fraud case); *Mead v. Johnson Group, Inc.,* 615 S.W.2d 685, 688 (Tex. 1981)(loss of credit is recoverable as actual damages in a suit where the damage to credit was the necessary and usual result of the defendant's action); *Sanchez v. Johnson & Johnson Medical, Inc.,* 860 S.W.2d 503, 511 (Tex.App.—El Paso 1993), *rev'd on other grounds,* 924 S.W.2d 925 (Tex.1996)(recognizing benefit of bargain and mental anguish damages in a fraud action); *Duval County Ranch Co. v. Wooldridge,* 674 S.W.2d 332, 336 (Tex.App.—Austin 1984, no writ)(extend-

ing *Mead* rationale to causes of action involving fraud).

Moreover, plaintiff obtained findings on his economic damages under a general damage submission, which was entirely proper. The jury awarded him $19,380 for loss of earnings and wage earning capacity and $2,916 for medical care. BPS, without explanation, ignores these findings on economic damage in making its argument. We find, however, that there were ample jury findings on damage issues to support a fraud judgment. Point of Error Eleven is overruled.

### Exemplary Damages

BPS attacks the trial court's award of exemplary damages from several angles. In Point of Error Nine, appellant claims that the judgment for exemplary damages was error, as such damages are not available for breach of contract. In Point of Error Sixteen, appellant asserts that the trial court erred in awarding exemplary damages because there was no finding of pecuniary damages resulting from fraud. In Point of Error Seventeen, appellant claims that the exemplary damage award was error because plaintiff obtained no finding that BPS acted wilfully or intentionally to injure plaintiff. Point of Error Eighteen asserts that the trial court's findings on exemplary damages do not support the award as a matter of law. We find each of these arguments to be without merit.

■■ BPS argues that exemplary damages should not have been assessed because it committed, at most, a breach of contract. This contention fails because, as discussed at length above, plaintiff Porras established that BPS committed fraud. *Trenholm,* 646 S.W.2d at 933. Defendant's intent to do harm or its conscious indifference to the rights of others will support an award of exemplary damages. *Spoljaric,* 708 S.W.2d at 436; *Trenholm,* 646 S.W.2d at 933; *Dennis v. Dial Finance & Thrift Co.,* 401 S.W.2d 803, 805 (Tex.1966). We have discussed the evidence supporting the jury's finding that BPS intentionally induced its employees to enter the employment contract by misrepresenting the company's workers' compensation policy. At the least, this supports a

conclusion that BPS was consciously indifferent to Porras's rights.

A number of specific factual findings made by the trial court and supported by the evidence lead to this conclusion. We adopt the following findings in affirming the trial court's decision to award exemplary damages, pursuant to the Supreme Court's mandate in *Transportation Insurance Co. v. Moriel,* 879 S.W.2d 10, 31–33 (Tex.1994).

> The representations concerning the type of worker's compensation coverage to be provided and the benefits to be provided to the employees were false. These false representations were made knowingly. The employees relied upon and believed these false representations.
>
> Noel Porras relied on and believed these false representations to his detriment and damage. Noel Porras was an innocent party.
>
> Weekly benefits, impairment benefits and medical benefits were being paid directly by the defendant rather than by its insurance. The money was being deposited in an account by Defendant and then the benefits were payable directly out of this account. Therefore, each dollar spent for any type of worker's compensation benefits came from the pocket of Defendant creating a motive for the defendant to fail to pay what it owed.
>
> BPS intentionally or recklessly underpaid Noel Porras for his weekly benefits by paying him only 50 percent of his average weekly wage instead of 75 percent.
>
> BPS failed to pay Noel Porras the amount due for his amputated finger until after suit was filed and after the deposition of its risk manager, who there testified that "they might look into paying Mr. Porras for his impairment benefit."
>
> The impairment benefits were paid based on 50 percent of the average weekly wage of Noel Porras rather than 70 percent; this miscalculation was either intentional or reckless.
>
> BPS told Porras he could not select his own doctor and refused to pay for treatment by his doctor and treatment ordered by his doctor. Under Texas workers' compensation law, he would have had the right

> to select his own doctor and BPS (or its insurer) would have had to pay for all reasonable and necessary treatment.
>
> BPS stopped paying Porras weekly benefits even though he had not been released by the doctor he had selected. Under Texas workers' compensation law, Defendant would have been required to continue paying benefits until Dr. Garza released him.
>
> The testimony of BPS's representative indicates an uncaring attitude concerning the financial duress placed on the family of Noel Porras by BPS's actions.
>
> BPS's president testified that it will continue to handle future workers' compensation claims in the manner it has handled the Noel Porras claim.
>
> BPS's president testified that the company has no documents indicating its net worth, which is completely unbelievable. This is a company of 3,500 to 4,000 employees with several branch offices. This indicates an attitude of disregard for the truth, and for the intelligence of the court and jury.
>
> An award of exemplary damages is needed to deter BPS from continuing to handle claims in the manner it handled Porras's claim, and further to deter other persons or companies from engaging in this type of conduct.
>
> An award of exemplary damages is needed to punish BPS for the conduct demonstrated in this case.

The award of exemplary damages was supported by the evidence, by the jury's findings, and by the trial court's findings. Points of Error Nine, Sixteen, Seventeen, and Eighteen are overruled.

### *Mental Anguish Award*

In Points of Error Twelve and Thirteen, appellant claims that the trial court erred in entering judgment for past and future mental anguish, as the evidence was legally and factually insufficient to support awards for past and future mental anguish. We have visited this legal issue many times, frequently noting that each case involving a mental anguish award is to be reviewed on its own facts, and that once plaintiff has

established some amount of mental anguish, the jury's decision as to the amount award in compensation is "virtually unreviewable." *Dillard's Department Stores, Inc. v. Strom,* 869 S.W.2d 654, 659 (Tex.App.—El Paso 1994, writ dism'd by agr.); *Worsham Steel Co. v. Arias,* 831 S.W.2d 81, 85 (Tex.App.—El Paso 1992, no writ); *Skaggs Alpha Beta, Inc. v. Nabhan,* 808 S.W.2d 198, 202 (Tex.App.—El Paso 1991, no writ). The courts have consistently defined mental anguish as:

[A] relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment, or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair, and/or public humiliation. *Strom,* 869 S.W.2d at 660, *quoting Trevino v. Southwestern Bell Telephone Co.,* 582 S.W.2d 582, 584 (Tex.Civ.App.—Corpus Christi 1979, no writ).

Here, the jury awarded Porras the fairly nominal sums of $1,500 for past mental anguish and $1,500 for future mental anguish. BPS challenges the awards on three grounds: first, that because fraud does not usually entail a physical injury, that there must be evidence of physical harm before mental anguish damages may be awarded; second, that the evidence fails to show proximate cause between the fraudulent acts and mental anguish; and third, that the evidence does not rise to that level of affliction required by Texas law. We disagree on all three counts.

■ First, we reject BPS's contention that Porras was required to prove physical injury as a prerequisite to recovery for mental anguish. This contention is simply incorrect. *Boyles v. Kerr,* 855 S.W.2d 593, 598 (Tex.1993)("We also are not imposing a requirement that emotional distress manifest itself physically to be compensable."). That Porras's recovery is grounded in fraud does not change the general rule. *Boyles,* 855 S.W.2d at 598 (listing causes of action where mental anguish damages are not recoverable, not mentioning fraud). This Court has specifically upheld awards for mental anguish in fraud cases, and has not required a physical

injury in doing so. *Strom,* 869 S.W.2d at 660. This contention is without merit.

■ Next, we examine the evidence to determine if Porras's mental anguish is sufficiently tied to BPS's wrongful acts to establish causation, and if it rises to the level of mental suffering required by the law. We conclude that the evidence is both legally and factually sufficient to support the mental anguish award. Porras testified that he suffered continued pain in his amputated finger, and wanted to consult a specialist, Dr. Garza. Under the Act, he would have had this right. BPS, however, refused to pay for any treatment by Dr. Garza, and treatment by that doctor, including a prescription for physical therapy, was delayed from early June 1992 until August 10, 1992. The jury could reasonably infer that had he received treatment by a specialist with physical therapy sooner, his finger would have healed more quickly, and that he suffered from this lack of treatment and therapy. During this time, his finger was too sore to touch, or even to cover with the prescribed guard. While he was unable to work and receiving inadequate benefits, things were "pretty hard" between he and his wife. They had a new baby and no income; they did not have enough money to even buy diapers. His utilities were cut off, and he was forced to borrow money to reconnect his water. He had no money to give his daughters, which was painful to him. During this time, he did not want to be around his house. He was forced to quit baseball, and to give up an invitation to try out for the Mexican professional baseball league. His dream of becoming a professional baseball player was lost forever. He worried about his bad credit.

Porras's brother testified that Noel was a "great baseball player" and had been planning to go into the Mexican league before his injury.

Carmen Porras, Noel's wife, also testified that her husband had plans and dreams about playing baseball. He was very upset after his last visit with Dr. Rama because he did not feel he was ready for a work release, and he wanted to see a specialist which BPS refused to authorize. After BPS cut off their checks, times were very hard. Her hair

started falling out, their water and cable were cut off, and she cried often. "He would always be upset. There were times I would walk into a room and he would be holding the baby in his hands and I could see he was real upset and I was, too." "He just wanted someone to take care of his finger," and was angry and desperate when Rama returned him to work before he was able to use it. Indeed, unbeknownst to Porras, BPS had already fired him five days before this premature release, allegedly because he failed to return to light duty.

We find this is sufficient evidence, both factually and legally, to support the mental anguish awards. Points of Error Twelve and Thirteen are overruled.

### Award for Damage to Credit Rating

In Points of Error Fourteen and Fifteen, appellant claims that the trial court erred in entering judgment for past and future damage to credit rating, as the evidence was legally and factually insufficient to support such an award. We disagree.

The jury awarded Porras $1,500 for loss of credit reputation in the past, and $1,500 for loss of credit reputation in the future, again fairly nominal amounts. Loss of credit reputation is recoverable as an element of actual damage in a suit where damage to credit is a necessary and usual result of the defendant's actions. *Provident American Insurance Co. v. Castaneda*, 914 S.W.2d 273 (Tex.App.—El Paso 1996, writ requested); *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 688 (Tex.1981). Here, where BPS paid weekly wage replacement benefits in an amount far less than an insurance carrier would have been required to pay under the Act, where no impairment income benefit was ever paid until after suit was filed, where doctor's bills, hospital bills, and physical therapy bills that would have been the responsibility of a worker's compensation carrier under the Act were not paid and all were referred for collection, where even the doctor and hospital bills that BPS acknowledged were its responsibility went to collection, damage to credit was a necessary and usual, indeed inevitable, result of defendant's actions. That argument fails.

As to the legal and factual sufficiency of loss of credit reputation evidence, we conclude the evidence supports the jury's award (which, as we noted above, was modest). The Porras family's utilities were disconnected. They received collection letters for medical bills. They were turned down for a loan at Kermit State Bank, where they had previously been able to obtain credit. At the time of trial, they were still receiving letters from collection agencies, and they still had outstanding medical bills for which BPS was responsible. This evidence is sufficient to support the damages for loss of credit reputation. Points of Error Fourteen and Fifteen are overruled.

### Evidence on Non-suited Defendant

In Point of Error Nineteen, appellant asserts that it was error to admit evidence on Corporate Underwriters, the insurance carrier located in the British West Indies which plaintiff non-suited before trial. Such evidence, BPS claims, was irrelevant to any claim, was prejudicial, and therefore should have been excluded.

Initially, we note that it was BPS's counsel who first raised the specter of Corporate Underwriters. He asked Noel Porras on cross-examination:

Q: Do you recall also suing Corporate Underwriters?

A: What's ... ?

Q: This lawsuit that we're here on today—this is not the only lawsuit that you've filed, is it?

Thus, BPS's protestations later in the trial when plaintiff's counsel introduced evidence of Corporate Underwriters, the prohibition against it selling insurance in Texas, and its nonsubscriber status under the Act were waived. This evidence was invited by BPS's cross-examination of the plaintiff. Porras was entitled to explain who Corporate Underwriters was, and why it was included in his lawsuit, after the topic was first raised by BPS.

Moreover, we believe the evidence on Corporate Underwriters was relevant to the fraud and exemplary damage issues in this case, and that the trial court did not

abuse its discretion in determining that evidence on this topic was more probative than prejudicial. The trial court's findings relating to the punitive damage award, filed pursuant to *Moriel*, 879 S.W.2d at 33, included four conclusions that involved Corporate Underwriters:

> Defendant knew that its insurance carrier, Corporate Underwriters, was not licensed in the state of Texas but failed to disclose this fact to White Well Service or the employees of White Well Service.

> Defendant knew that the state of Texas had filed suit for injunction against Corporate Underwriters and its agent, RMI, but failed to disclose this fact to White Well Service and its employees.

> Defendant knew that a temporary injunction had been issued in the lawsuit against Corporate Underwriters and RMI but failed to disclose this fact to White Well Service and its employees.

> The president and sole stockholder of Defendant, Lawrence Ashcroft–Smith, testified that he 'saw no reason then or now' to advise White Well Service about the fact that Corporate Underwriters was not licensed to do business in Texas, was being sued by the state of Texas and had been enjoined. This attitude indicated Defendant would not likely change its conduct absent some type of deterrent such as a punitive damage award.

The trial court was within its discretion in allowing this evidence to be placed before the jury: that BPS knowingly obtained insurance from a carrier who had been enjoined from soliciting business in Texas, and did not reveal that carrier's status to those people who were relying upon its coverage, is evidence of intent, of knowledge that its representation was false, and of a reckless state of mind. We conclude that the trial court acted properly in allowing this evidence before the jury. Point of Error Nineteen is overruled.

### Evidence on Attorney's Fees

In Point of Error Twenty, appellant contends that the trial court erred in allowing plaintiff's counsel to present evidence on attorney's fees, as Porras's counsel had not supplemented his answers to discovery to include the amount of attorney's fees he would testify to until shortly before trial. Although the trial court made a finding of good cause following a hearing on the issue, BPS contends that the evidence does not support that finding. We believe that there was no abuse of discretion, and alternatively we find that any error was harmless.

TEX.R.CIV.P. 215(5) provides in part:

> A party who fails to respond to or supplement his response to a request for discovery shall not be entitled to present evidence ... or to offer the testimony of an expert witness ... unless the trial court finds that good cause sufficient to require admission exists.

The good cause exception to this rule permits a trial court, within its sound discretion, to excuse a failure to comply in difficult or impossible circumstances. *Alvarado v. Farah Manufacturing Co., Inc.*, 830 S.W.2d 911, 914 (Tex.1992). Here, Porras introduced testimony at the good cause hearing that counsel could not provide information on the number of hours worked on the case earlier because a large part of the work was necessarily performed in the last month before trial, and thus could not have been supplied more than thirty days before trial. Porras had designated the experts witnesses who testified on attorney's fees more than thirty days before trial, and there was no surprise as to the subject matter of their testimony. We believe the sum total of testimony supports the trial court's finding of good cause.

Moreover, even if there was error in finding good cause, we find it was harmless. The trial court did not award attorney's fees, nor did the jury answer any special issue as to the amount of attorney's fees. In order to establish reversible error, the appellant must show that an error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. TEX.R.APP.P. 81(b)(1). Ordinarily, we will not find harmful error in rulings on the admissibility of evidence where the evidence is not controlling on a material issue dispositive of the case. *Ramirez v. Ramirez*, 873 S.W.2d 735, 738 (Tex.App.—El Paso 1994, no writ). Here, the only issue to which attorney's fees were

relevant was the calculation of exemplary damages.[8] The evidence established that Porras's counsel was working on a contingent fee, so testimony on the number of hours worked and a reasonable hourly rate for those hours was peripheral, at best. We overrule Point of Error Twenty.

### CONCLUSION

We conclude that the agreement between BPS and Noel Porras is not enforceable against Porras. We also agree with the trial court that Porras is entitled to judgment for fraud, for negligence, and for exemplary damages. The trial court's judgment is affirmed.

---

**8.** The jury question on exemplary damages included six factors the jury could consider, the last of which was "compensation for inconvenience and attorney's fees."